IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| SEBREN KHUFU, | ) | CIVIL NO. 10-00262 LEK-BMK |
| | ) | |
|       Plaintiff, | ) | |
| | ) | |
|    vs. | ) | |
| | ) | |
| JONES RETAIL CORPORATION and | ) | |
| JONES APPAREL GROUP | ) | |
| CORPORATION, | ) | |
| | ) | |
|       Defendant. | ) | |
| _____ | ) | |

**ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Before the Court is Defendants JAG Footwear,
Accessories and Retail Corporation, formerly known as Jones
Retail Corporation, and The Jones Group Inc., formerly known as
Jones Apparel Group, Inc.'s (collectively "Defendants" or "Jones
Group") Motion for Summary Judgment ("Motion"), filed on March 8,
2011. Plaintiff Sebren Khufu ("Plaintiff" or "Khufu") filed his
memorandum in opposition on April 18, 2011, and Defendants filed
their reply on April 25, 2011. This matter came on for hearing
on May 16, 2011. Appearing on behalf of Defendants was
Lani Narikiyo, Esq., and appearing on behalf of Plaintiff was
Charles Brower, Esq. After careful consideration of the Motion,
supporting and opposing memoranda, and the arguments of counsel,
Defendants' Motion is HEREBY GRANTED IN PART AND DENIED IN PART
for the reasons set forth below.

**BACKGROUND**

I.  **Factual Background**

Defendants hired Plaintiff on June 4, 2007 to work in Defendants' Waikiki retail store and terminated him in February 2008.  Plaintiff alleges that Defendants terminated his employment because of his race (African-American), color (black), and age (over forty-five) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq.*, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Hawai'i Anti-Discrimination Act, Hawai'i Revised Statutes § 378-2 (Counts I and IV).  Plaintiff further alleges that he was subjected to a hostile work environment based on the allege discrimination (Count II), and suffered emotional distress due to Defendants' actions (Count III).

A.  **Plaintiff's Hiring**

Defendants hired Plaintiff to work as a Sales Associate in its Waikiki Nine West shoe store.  [Plaintiff's Separate Concise Statement of Material Facts in Opposition ("CSOF"), Decl. of Sebren Khufu ("Khufu Decl."), ¶ 1.]  He was hired by Manager Freeah Samuelsson, a Caucasian in her twenties or early thirties. [Id.]  As a Sales Associate, Plaintiff was expected to comply with all company policies and procedures as outlined in company manuals.  [Defendants' Separate and Concise Statement of Facts ("CSOF"), Exh. D, attached to Decl. of Michele Gatdula-Santiago

("Santiago Decl.").] According to Plaintiff, he was "the top sales person from the day [he] was hired." [Khufu Decl. ¶ 1.]

Before he was hired, Plaintiff alleges that he went to the retail location to request an employment application, and Manager Michele Santiago "said that she knew I didn't feel comfortable as a male in a female store and I could fill out the application outside and bring it back into the store when I was done, but I was not allowed to take the application home with me." [Id. ¶ 6.] According to Plaintiff, Samuelsson left him a message telling him to come for an interview, and Plaintiff states that "I could hear Santiago in the background telling Samuelsson not to hire me." [Id.] Plaintiff also claims that:

> 8. I interviewed with Samuelsson in June 2007 in the downstairs lobby of the Hyatt Regency. She commented that it was unlikely that someone that looks like me would be hired at the Nine West store, and if not for her, I would not have been hired for the job.
>
> 9. Samuelsson told me that most of the retail companies in Waikiki do not hire African-American employees. I told Samuelsson that I knew about this trend in Waikiki and it was ridiculous that employers look at what a person looks like rather than at their qualifications for the job.
>
> 10. Samuelsson told me that if not for her I would probably not have been hired as Defendants did not normally hire black men of my age.

[Id. at ¶¶ 8-10.]

According to Samuelsson, she did not tell Plaintiff

that somebody who looks like him would not normally be hired by Defendants, or that, but for her, he would not get hired by Defendants, or that, people of his race, color, or age do not get hired by Defendants. [Defendants CSOF, Decl. of Conrad Kee ("Kee Decl."), Exh. M, 12/21/10 Deposition of Freeah Samuelsson ("Samuelsson Depo."), at 49-50, 58-59.] Samuelsson left Nine West around November 2007, and Santiago became Plaintiff's manager. [Khufu Decl. ¶ 12.]

Santiago disputes that she told Samuelsson not to hire Plaintiff. She says that Plaintiff "raised this issue with me shortly after he was hired. I informed him he was mistaken and that he had heard an unrelated conversation I was having with another employee in the back room. Mr. Khufu seemed satisfied with my response. He did not say or do anything that would indicate he believed that this had something to do with his race, age, or color." [Santiago Decl. ¶ 5.]

According to Plaintiff, after he started working in June 2007, "Defendants' employees made remarks regarding my race and age to me while I was employed by Defendants." [Khufu Decl. ¶ 11.]

According to Plaintiff, in November 2007, he "was instructed by Santiago to tell a black male who had requested an employment application that she was not available and that he would be wasting his time by filling ou[t] the application."

[Khufu Decl. ¶ 13.]  Santiago also accepted a gay male's employment application and "after he left the store, she said that there was no way she would ever hire him.  She said that she . . . could not tell if he was male or female when she first saw him."  [<u>Id.</u> at ¶ 14.]

**B.  <u>June 20, 2007 Incident</u>**

Shortly afer he began work, Plaintiff was involved in an incident with co-worker Michael Nakama on June 20, 2007.  According to Plaintiff, while he was working on stock, Nakama told him to take out the trash, and he responded by asking "why was it always me that had to take out the trash."  [Khufu Decl. ¶ 26.]  Nakama then walked by, bumping Plaintiff twice.  [<u>Id.</u>]  Plaintiff informed Santiago of the incident, while she was speaking with Samuelsson.  [<u>Id.</u>]  In a written statement to Santiago about the incident, Plaintiff did not indicate that the incident related to his race, color or age [Plaintiffs' CSOF, Decl. of Charles Bower ("Brower Decl."), Exh. 6,] and acknowledged at deposition that this written complaint made no reference to race, color or age discrimination.  [Kee Decl., Exh. L, 2/21/11 Deposition of Sebren Khufu ("Khufu Depo."), at 61-66.]

According to Santiago, when Plaintiff reported the incident, she looked into the matter and asked for each employee's version of events; Plaintiff related that Nakama intentionally bumped into him and Nakama "who was in his mid-

50's, told me it was an accident." [Santiago Decl. ¶ 6.]
Santiago addressed the matter with both employees and Santiago
stated that Plaintiff seemed satisfied with how she handled the
matter. [Id. at ¶¶ 6-7.] Nakama's employment with Jones Group
ended in the summer of 2007 when he stopped coming to work as
scheduled. [Id. at ¶ 8.]

### C. **Associate Progressive Counseling Forms and Warnings**

On several occasions, Plaintiff violated company policies
and his conduct was documented on Associate Progressive
Counseling forms. [Santiago Decl. ¶ 12.] Other employees also
violated company policies and their conduct was recorded on
Associate Progressive Counseling forms as well. [Id.]

On or around November 11, 2007, Plaintiff issued a
customer a refund in violation of company policy. He claims that
he had not been informed that only a manager could issue a
refund. [Khufu Decl. ¶ 19.] Plaintiff received a first written
warning, recorded on a November 13, 2007 Associate Progressive
Counseling form. [Brower Decl., Exh. 2.]

On November 15, 2007, Plaintiff accepted a $200 cash
payment from a customer, but according to Santiago, failed to put
the cash completely in the register; Plaintiff claims that he did
place the two $100 bills completely in the register. [Khufu
Decl. ¶ 20.] That same day, Plaintiff was asked to remain at
work for one extra hour because a co-worker had been injured on

the job, but Plaintiff left when his shift ended without notifying management. These two incidents resulted in a second written warning, recorded on a November 15, 2007 Associate Progressive Counseling form. [Brower Decl., Exh. 3.] The second written warning states that if "improvement is not made, this can and will lead to termination." [Id.]

On December 6, 2007, Plaintiff left the store without following closing procedures and did not notify the manager, and as a result received a final warning, recorded on a December 13, 2007 Associate Progressive Counseling form. [Brower Decl., Exh. 4.] According to Plaintiff, he did tell the manager on duty, Tracy Brown, that he was leaving the store at 11:25 p.m. that day, and there were many times when other employees left before 11:30 p.m. [Khufu Decl. ¶ 18.]

Plaintiff states that, starting in November 2007, he began to receive "false and unwarranted disciplinary write ups from Santiago." [Khufu Decl. ¶ 15.] Santiago asserts that the documentation of any issues regarding Plaintiff was consistent with that of other employees. [Santiago Decl. ¶ 12.]

D. **Other Workplace Incidents**

According to Plaintiff, on an unspecified date, he heard Tracy Brown talking on her cell phone in the back of the store and she "said 'she was working with a black guy and she didn't know if she should be scared or not.'" [Khufu Decl.

7

¶ 23.]  Plaintiff also claims that in December 2007, he had a conversation with Brown about hair styles "when she made a comment to me that she is just a 'little white girl with straight hair' and that she washes her hair every couple of days so that she doesn't wash out the natural oils in her hair."  [Id. at ¶ 24.]

Plaintiff also states that, "[a]t some point I was told that everyone in the store was a manager except for me and a 16 year old female employee."  [Khufu Decl. ¶ 24.]

On January 20, 2008, Plaintiff was sent home from work by Assistant Manager Claire Neyra for being inappropriately dressed.  Plaintiff asserts that he had worn that particular outfit to work previously, but that Neyra "did not like my outfit and sent me home."  [Khufu Decl. ¶ 21.]  Plaintiff claims that another employee, "Rob" (a Caucasian in his twenties), was "allowed to wear shirts with labeling on them but I was not.  I was written up for no reason."  [Id. at ¶ 22.]

**E.    Work Schedule Disputes and Plaintiff's Termination**

According to Plaintiff, he was to be attending school at the time he was hired, and asked to work evening hours, but that he "was not expecting to work until the store closed at 11:30.  I had to get up early in the morning for school."  [Khufu Decl. ¶ 16.]  He says that he "was usually scheduled for the closing shift when Santiago knew I had school the next day and

8

closing the store would interfere with my homework and study schedule." [Id. at ¶ 17.]

Plaintiff claims that when he asked why he was being scheduled for closing times, he was not given an explanation. [Khufu Decl. ¶ 27.] And other employees "received the work/hours they wanted. Brown had a second job and Defendants' man[a]gers worked around Brown's schedule to accommodate her, but would not do the same for me." [Id. at ¶ 28.]

Santiago states that she typically prepared schedules for the store one month in advance, and that schedules would "generally be hung up in the store for employees to review and employees were responsible for checking the schedule." [Santiago Decl. ¶ 24.] "If employees had unexpected issues regarding scheduling, they were responsible for contacting me[,]" said Santiago. [Id.] Plaintiff was aware of the scheduling process, according to Santiago. [Id.]

According to Santiago, she prepared the store schedules for January 2008, and likely posted them sometime in December 2007. [Id. at ¶ 15.] Plaintiff claims that Santiago prepared and posted weekly schedules the week prior to the next work week. [Khufu Decl. ¶ 16.]

On both January 15 and January 18, 2008, Plaintiff was scheduled to work from 4:00 p.m. to 11:30 p.m., but did not report to work or call. [Santiago Decl. ¶ 16.] On January 22,

2008, Plaintiff was scheduled to work from 3:00 p.m. until 9:30 p.m., but did not call or report to work. On January 25, Plaintiff was scheduled to work from 9:00 a.m to 4:00 p.m., but did not report to work or call. On February 1, 2008, Plaintiff was scheduled to work from 4:00 p.m. to 11:30, but again, failed to report to work or call. [Id. at ¶ 18.]

Santiago asserts that, each time Plaintiff failed to report to work or call in, she attempted to contact him by telephone, but he did not answer, and each time she left a message, but Plaintiff did not return her call. [Santiago Decl. ¶ 20.] The six absences are also recorded in a February 6, 2008 Associate Progressive Counseling form. [Santiago Decl., Exh. B.]

Plaintiff claims that he gave his school schedule to Assistant Manager Neyra "at the beginning of the Spring semester. I also spoke to her on January 10, 2008, about a conflict between my work schedule and my school schedule. I would be scheduled for the exact days/times that I was supposed to be in class." [Khufu Decl. ¶ 16.] "When I did not come to work because I had school, one of the managers would call me to ask why I was not at work. I could not call in because I was in class." [Id.]

According to Plaintiff, "[t]he managers knew why I was not at the store as they had my school schedule that I gave them at the beginning of the semester. I was purposely scheduled on my school days, and [then] fired because I did not come to work."

[<u>Id.</u> at ¶ 31.]

Defendants claim that Plaintiff was terminated as a result of his repeated failure to comply with the attendance policy. Andrew Poulin, a Human Resources Manager with Jones Group, made the decision to terminate Plaintiff in February 2008, "in conjunction with Betsy Eddy (District Sales Manager)." [Defendants' CSOF, Decl. of Andrew Poulin ("Poulin Decl."), ¶ 6.] According to Poulin,

> Although there may have been information in Jones' records regarding Mr. Khufu's race, color, and age, I did not consider this information and it played no role in the decision to terminate his employment. Terminating an employee who failed to report to work a total of six times is fully consistent with other terminations I have handled while Human Resources Manager.

[<u>Id.</u> at ¶ 7.] From January 2007 until February 2008, five employees including Plaintiff were terminated for non-compliance with attendance rules: two employees in the Kahala store (identified as "White" and "Asian") and two other employees at the Waikiki store (both identified as "Asian"). [<u>Id.</u> at ¶ 10, Exh. F.]

According to Plaintiff, he was given "various reasons for . . . my termination. District Manager Betsy Eddy told me that I was terminated because I failed to show up for work." [Khufu Decl. ¶ 4.]

**F.   <u>Plaintiff's Complaints to Defendants</u>**

Plaintiff attests that he reported "inappropriate

actions to Defendants' home office in New York, but the Actions
(sic) continued as Defendants' did not correct . . . what was
happening in its Waikiki store where I was employed." [Id. at
¶ 32.]  Plaintiff sent an email dated December 18, 2007 to
Peter Bonepath at the Nine West corporate office, complaining
about Plaintiff's co-workers and managers.  [Brower Decl., Exh.
7.]  The December 18, 2007 email states that another employee,
Isaac Gonzalez, left the store for twenty-five minutes when he
was not on a break, and later provoked an argument with
Plaintiff, telling him that Plaintiff was "on [his] F@@@ way out
any way."  [Id.]  He also states that, during a busy night,
Betsy Eddy told him "in a rude and loud voice not to come behind
the counter and that she will ring up everyone[,]" and he alleged
that Eddy rang up "an item under someone elses [sic] that I
should have gotten credit for."  [Id.]  Plaintiff also complains
in the email about co-workers going to Starbucks while on the
clock.  The email does not mention race, color, or age
discrimination.  [Id.]

On January 11, 2008, Plaintiff sent a fax to the Nine
West corporate office, stating that Neyra told Plaintiff that
Santiago "received a complaint that I refuse to have my bag
checked when I leave the store after a work shift.  I told
Ms. Neyra that this is 100% not true."  [Brower Decl., Exh. 10.]
Plaintiff said "I would rather not bring a bag to work because I

12

never know what could happen if Issac [sic] Gonzalez or Michele [sic] Santiago is there. I strongly believe they will try something if I have a bag in the store." [Id.]

On January 15, 2008, Plaintiff sent another fax, in which he discussed his problems scheduling work and school. [Brower Decl., Exh. 11.] Plaintiff says that he told Neyra that he would only be able to work on Saturday nights, and she told him that all schedule changes are supposed to be done two weeks before they are done. . . . [T]his is my first time hearing anything about a dead line [sic] when wanting to change days on the schedule." [Id.] Plaintiff sent another undated fax repeating concerns about his schedule conflicting with school. [Brower Decl., Exh. 12.] Plaintiff sent a final fax on February 21, 2008 concerning his scheduled work days and school conflicts. [Brower Decl., Exh. 13.] None of the faxes references race, color, or age discrimination.

### G. **Procedural Background**

Plaintiff filed a Charge of Discrimination with the Hawai'i Civil Rights Commission ("HCRC"), dual-filed with the Equal Employment Opportunity Commission ("EEOC"), on August 20, 2008, alleging discrimination due to race (African-American), color (black), and age (forty-five at the time of the alleged discrimination). [Kee Decl., Exh. H; Khufu Decl. ¶ 5.] Plaintiff did not check the box labeled "Retaliation" on the

13

Charge of Discrimination form.  Plaintiff received a right-to-sue letter from the HCRC, dated August 4, 2009.  [Brower Decl., Exh. N.]  Plaintiff filed his Complaint on November 2, 2009.

## II.  **Defendants' Motion**

Defendants seek summary judgment on the grounds that: (1) Plaintiff's retaliation claim fails because he did not exhaust administrative remedies or engage in protected activity; (2) Plaintiff was not subjected to a hostile work environment; (3) Plaintiff was terminated due to his failure to report to work and not due to discrimination based on his race, color, or age; and (4) Plaintiff cannot maintain a claim for infliction of emotional distress.  Defendants also assert that Plaintiff's economic damages are limited to $4,800.  Each argument is set forth more fully below.

### A.  **Retaliation (Count IV)**

Defendants first argue that Plaintiff's retaliation claim must be dismissed for failure to exhaust administrative remedies because his HCRC Charge of Discrimination did not include retaliation.  Plaintiff did not check the box for retaliation or include any details relating to his retaliation claim in the narrative section.  [Mem. in Supp. of Motion at 7.]

Next, Defendants argue that Plaintiff did not engage in any protected activity, and cannot establish a prima facie case for retaliation.  Plaintiff did not oppose a discriminatory

employment practice, and his complaints to Defendants' corporate office did not reference race, color, or age discrimination. [Id. at 8-9.]  For these reasons, Defendants argue that Count IV fails to state a claim for retaliation.

###### B. __Hostile Work Environment (Count II)__

Defendants claim that Plaintiff fails to state a prima facie claim for hostile work environment because he cannot establish that he was subject to conduct of a racial or age-based nature.  Further, Defendants claim that Plaintiff could identify only two comments related to race at his deposition, and that this conduct was not sufficiently severe and pervasive to create a hostile work environment.  [Id. at 10-11.]

###### C. __Race, Color, and Age Discrimination (Count I)__

According to Defendants, Plaintiff has not met his burden of establishing a prima facie case of discrimination because he cannot show that he was performing up to Jones Group's legitimate expectations or that Jones Group treated similarly situated younger, non-black employees more favorably.  [Id. at 12-13.]

Defendants also argue that Plaintiff cannot establish that Jones Group's legitimate business reason for terminating him was pretextual.  Poulin, the Human Resources Manager who made the ultimate decision to terminate Plaintiff, did not consider Plaintiff's race, color or age when making the decision,

according to Defendants.  [Id. at 15.]

### D.   Emotional Distress Claim (Count III)

Defendants argue that they are entitled to summary judgment on Plaintiff's intentional infliction of emotional distress ("IIED") claim because Plaintiff made no allegations that Defendants engaged in acts that were outrageous, without just cause, or beyond all bounds of decency.  [Id. at 16.]

### E.   Economic Damages

Last, in the event that any claims survive the Motion, Defendants assert that Plaintiff's economic damages are limited to $4,800.  After he was terminated by Jones Group, Plaintiff worked at Banana Republic in Waikiki from June 2008 to January 2009, when the store closed.  [Kee Decl., Exh. K, Plaintiff's Answers to Interrogatories, at ¶¶ 9, 11.]  There, Plaintiff earned ten dollars per hour for thirty hours per week, the same rate he earned at Nine West.  [Id. at ¶ 9.]  As of September 1, 2010, Plaintiff stated that he was not looking for work because he was a full-time student.  [Id. at ¶ 11.]

Defendants claim that Plaintiff has a duty to use reasonable diligence to find other employment in order to mitigate his damages.  [Mem. in Supp. of Motion at 16.]  Because Plaintiff was terminated in February 2008, and began working at Banana Republic in June 2008, but stopped looking for work when the Banana Republic store closed in January 2009, Plaintiff's

maximum potential damages are limited to the period from
February 6, 2008 through May 2008.  [Id.]  Defendants calculate
Plaintiff's damages at $10 per hour for thirty hours per week
($300 per week) for sixteen weeks, for a total amount of $4,800.
Defendants ask that partial summary judgment be granted to limit
Plaintiff's claim for lost wages to no more than $4,800.

III. **Plaintiff's Memorandum in Opposition**

         Plaintiff argues in opposition that the actions of
Plaintiff's "co-workers and managers indicate the tone of
discrimination at the store and the underlying racially motivated
actions in creating the scenario to terminate Plaintiff."  [Mem.
in Opp. at 5.]  Plaintiff argues that Defendants have not
rebutted his claim that he was the highest producing Sales
Associate at the store, and that "[n]o other employees were set
up to be fired as was Plaintiff."  [Id.]

         According to Plaintiff, the fact that Poulin made the
decision to terminate him "is not dispositive in light of the
recent Supreme Court decision in Staub v. Proctor, [131 S. Ct.
1186] (2011), which held that the Court must look at all
incidents of adverse employment action, not just the final
decision."  [Id. at 5-6.]

         Plaintiff disputes the facts as presented by
Defendants, arguing that he was falsely accused of violating
company policies, and that he had "informed management that he

could not work on the days he was terminated for by not calling in nor working." [Id. at 3.] Plaintiff asserts that there are genuine issues of material fact precluding summary judgment.

## IV. Defendants' Reply

In reply, Defendants argue that there are no genuine issues of material fact, and the Court should dismiss case in its entirety. Defendants claim that Plaintiff's affidavit "deals only with petty slights not relevant to the issues before the Court" and that there is no connection between these issues and Plaintiff's termination, nor is there any evidence that his termination was based on improper discrimination. [Reply at 2.]

Defendants assert that Plaintiff's opposition failed to address, and therefore abandoned, several of his claims. They claim Plaintiff failed to provide any evidence of a hostile work environment, offered no challenge to their defense to his retaliation claim, and made no effort to support his claim for intentional infliction of emotional distress. [Id. at 3-4.]

According to Defendants, Plaintiff offers no admissible evidence that contradicts the showing that Plaintiff was terminated based on his violations of the attendance policy, and was not subject to illegal discrimination. Defendants claim they made substantial efforts to accommodate Plaintiff's school schedule, and that Plaintiff failed to explain why the company was required to "schedule him for work only one day per week

because of his 6 credit hour schedule[.]" [Id. at 5.] Plaintiff
was aware of his class schedule months before the semester began,
but Defendants argue that he neglected to inform them of his
schedule until January 2008. [Id.] Waiting until January 2008
to inform his managers of his scheduling conflicts was too late
to enable them to accommodate his class schedule for January or
February 2008, according to Defendants. [Id. at 6.] To the
extent Plaintiff alleges that he was purposely scheduled to work
on days that he had classes, Defendants argue that those claims
are conclusory and lack foundation. [Id.]

Next, Defendants assert that Plaintiff's opposition
made no attempt to rebut their showing that other employees were
not treated more favorably with respect to scheduling or
attendance. [Id. at 7.]

Defendants also argue that portions of Plaintiff's
Declaration are inadmissible and should be disregarded, because
they are self-serving and uncorroborated by other testimony.
[Id. at 7-8.] For example, Plaintiff states that Santiago
prepared weekly schedules only one week in advance, [Khufu Decl.
¶ 30,] but Defendants argue that he had no personal knowledge of
when she prepared the schedules. [Reply at 8.] Defendants also
argue that Plaintiff's assertion that his termination was
discriminatory because he informed management of his scheduling
conflict, and because he did not commit the violations for which

19

he was written up, is conclusory, and unsupported by evidence. Finally, Defendants posit that Plaintiff's assertion that Samuelsson told him that Defendants do not hire African-Americans is hearsay and is contradicted by her deposition testimony. [Id. at 8-9.]

Defendants contest Plaintiff's reliance on Staub, arguing instead that the case is not applicable here because Plaintiff's termination was based on his absences, rather than a violation of some prior corrective action or directive. [Id. at 9-10.] Defendants argue that there is no evidence that any supervisor was motivated by unlawful animus, like race or age discrimination, so the theory in Staub does not apply.

**STANDARD**

Pursuant to Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

> Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial. See Celotex [Corp. v. Catrett], 477 U.S. [317,] 323 [(1986)]. A moving party has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000). The burden initially falls on the moving party to identify for the court "those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809

20

F.2d 626, 630 (9th Cir. 1987) (citing <u>Celotex Corp.</u>, 477 U.S. at 323). "A fact is material if it could affect the outcome of the suit under the governing substantive law." <u>Miller [v. Glenn Miller Prods., Inc.]</u>, 454 F.3d [975,] 987 [(9th Cir. 2006)].

When the moving party fails to carry its initial burden of production, "the nonmoving party has no obligation to produce anything."  In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything. <u>Nissan Fire</u>, 210 F.3d at 1102-03.  On the other hand, when the moving party meets its initial burden on a summary judgment motion, the "burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial." <u>Miller</u>, 454 F.3d at 987.  This means that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986) (footnote omitted).  The nonmoving party may not rely on the mere allegations in the pleadings and instead "must set forth specific facts showing that there is a genuine issue for trial." <u>Porter v. Cal. Dep't of Corr.</u>, 419 F.3d 885, 891 (9th Cir. 2005) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986)). "A genuine dispute arises if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>California v. Campbell</u>, 319 F.3d 1161, 1166 (9th Cir. 2003); <u>Addisu v. Fred Meyer, Inc.</u>, 198 F.3d 1130, 1134 (9th Cir. 2000) ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

On a summary judgment motion, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." <u>Miller</u>, 454 F.3d at 988 (quotations and brackets omitted).

<u>Rodriquez v. Gen. Dynamics Armament & Technical Prods., Inc.</u>, 696 F. Supp. 2d 1163, 1176 (D. Hawai'i 2010) (some citations omitted).

## I.   Retaliation (Count IV)

Under Title VII, an employer may not discriminate against an employee because the employee has opposed an employment practice made unlawful by Title VII.  42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice [prohibited by Title VII] . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."); Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 59 (2006) ("Title VII's anti-retaliation provision forbids employer actions that discriminate against an employee . . . because he has opposed a practice that Title VII forbids or has made a charge, testified, assisted, or participated in a Title VII investigation, proceeding, or hearing." (citations and quotation marks omitted)).

A plaintiff first must exhaust his administrative remedies before bringing a Title VII claim in federal court. Sommatino v. United States, 255 F.3d 704, 707 (9th Cir. 2001) (citing 42 U.S.C. § 2000e-16(c)).  The scope of a Title VII action depends on the scope of the EEOC charge.  Id. at 708.  A federal court therefore may not consider allegations outside the EEOC charge.  See Freeman v. Oakland Unified Sch. Dist., 291 F.3d

632, 636 (9th Cir. 2002). Plaintiff's HCRC/EEOC charge did not include allegations of retaliation, therefore, Plaintiff has not exhausted his administrative remedies with respect to his retaliation claim.

Further, at the May 16, 2011 hearing on the Motion, Plaintiff's counsel acknowledged that the record does not demonstrate that Plaintiff complained to Defendants' home office regarding discrimination based on race, color, or national origin. Moreover, based on the Court's review of the record, it does not appear that Plaintiff opposed a practice that Title VII forbids, and there is no evidence that Plaintiff suffered an adverse employment action because of any such complaint. The Court therefore GRANTS Defendants' Motion as to Count IV.

## II. <u>Hostile Work Environment (Count II)</u>

A hostile work environment claim based on race requires that a plaintiff show that: (1) he was subjected to verbal or physical conduct of a racial nature; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the employee's conditions of employment and create an abusive work environment. <u>Vasquez v. County of Los Angeles</u>, 349 F.3d 634, 642 (9th Cir. 2003).

At the May 16, 2011 hearing on the Motion, Plaintiff's counsel conceded that the conduct at issue was not sufficiently severe or pervasive to support a claim for hostile work

environment.  The Court agrees and therefore GRANTS Defendants'
Motion as to Count II.

## III. **Intentional Infliction of Emotional Distress (Count III)**

"The elements of the tort of intentional infliction of
emotional distress are 1) that the act allegedly causing the harm
was intentional or reckless, 2) that the act was outrageous, and
3) that the act caused 4) extreme emotional distress to another."
Hac v. Univ. of Haw., 102 Hawai'i 92, 106-07, 73 P.3d 46, 60-61
(2003) (adopting IIED standard from Restatement (Second) of
Torts).

> In explaining the type of "outrageous" conduct
> that makes a claim for intentional infliction of
> emotional distress actionable, the Restatement
> (Second) of Torts states:
>
>> It has not been enough that the defendant has
>> acted with an intent which is tortious or
>> even criminal, or that he has intended to
>> inflict emotional distress, or even that his
>> conduct has been characterized by "malice,"
>> or a degree of aggravation which would
>> entitle the plaintiff to punitive damages for
>> another tort.  Liability has been found only
>> where the conduct has been so outrageous in
>> character, and so extreme in degree, as to go
>> beyond all bounds of decency, and to be
>> regarded as atrocious, and utterly
>> intolerable in a civilized community.
>> Generally, the case is one in which the
>> recitation of the facts to an average member
>> of the community would arouse his resentment
>> against the actor, and lead him to exclaim,
>> "Outrageous!"

Ross v. Stouffer Hotel Co. (Hawai'i) Ltd., Inc., 76 Hawai'i 454,
465 n.12, 879 P.2d 1037, 1048 n.12 (1994) (quoting Restatement

(Second) of Torts § 46, cmt. d. (1965)). "The question whether the actions of the alleged tortfeasor are . . . outrageous is for the court in the first instance, although where reasonable persons may differ on that question it should be left to the jury." Nagata v. Quest Diagnostics Inc., 303 F. Supp. 2d 1121, 1127 (D. Hawaiʻi 2004) (citing Shoppe v. Gucci Am., Inc., 94 Hawaiʻi 368, 387, 14 P.3d 1049, 1068 (2000)).

At the May 16, 2011 hearing on the Motion, Plaintiff's counsel conceded that the conduct at issue was not sufficiently outrageous or extreme to support a claim for intentional infliction of emotional distress. The Court agrees and therefore GRANTS Defendants' Motion as to Count III.

## IV. Race, Color, and Age Discrimination (Count I)

The Court follows the framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), as to Plaintiff's Title VII discrimination claims.

> McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed.2d 668 (1973), provides a "useful tool at the summary judgment stage" in addressing Title VII claims. See McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1122 (9th Cir. 2004). Under this framework, Plaintiff has the initial burden to establish a prima facie case of discrimination. E.E.O.C. v. Boeing Co., 577 F.3d 1044, 1049 (9th Cir. 2009) (citation and quotation omitted). "The requisite degree of proof necessary to establish a prima facie case for Title VII . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." Cordova v. State Farm Ins. Cos., 124 F.3d 1145, 1148 (9th Cir. 1997) (citation omitted).

<u>Hughes v. Mayoral</u>, 721 F. Supp. 2d 947, 957-58 (D. Hawai'i 2010).

A prima facie case under <u>McDonnell Douglas</u> requires a plaintiff to offer proof that: (1) he belongs to a protected class; (2) he performed his job adequately or satisfactorily; (3) he suffered an adverse employment action; and (4) other similarly situated employees who do not belong to the same protected class were treated differently. <u>McDonnell Douglas</u>, 411 U.S. at 802; <u>Cornwell v. Electra Cent. Credit Union</u>, 439 F.3d 1018, 1028 (9th Cir. 2006); <u>Noyes v. Kelly Servs.</u>, 488 F.3d 1163, 1168 (9th Cir. 2007).

> After a plaintiff establishes a prima facie showing of discrimination, the burden under the <u>McDonnell Douglas</u> framework shifts to a defendant to put forward a legitimate, non-discriminatory reason for its actions. <u>McDonnell Douglas Corp.</u>, 411 U.S. at 802, 93 S. Ct. 1817. A defendant's burden to articulate some legitimate, nondiscriminatory reason for the challenged action is merely a burden of production, not persuasion. <u>Chuang v. Univ. of Cal. Davis Bd. of Trs.</u>, 225 F.3d 1115, 1123-24 (9th Cir. 2000). If a defendant puts forth a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to show that the given reason is merely pretext for a discriminatory motive. <u>Boeing Co.</u>, 577 F.3d at 1049 (citation and quotation omitted).

<u>Hughes</u>, 721 F. Supp. 2d at 957-58.

"[A] plaintiff's burden is much less at the prima facie stage than at the pretext stage." <u>Hawn v. Exec. Jet Mgmt., Inc.</u>, 615 F.3d 1151, 1158 (9th Cir. 2010). That is, circumstantial evidence of pretext must be specific and substantial, <u>see</u>

26

Becerril v. Pima Cnty. Assessor's Office, 587 F.3d 1162, 1163

(9th Cir. 2009), and a plaintiff must do more than merely deny

the credibility of the defendant's proffered reason.  See Schuler

v. Chronicle Broad. Co., 793 F.2d 1010, 1011 (9th Cir. 1986).  "A

plaintiff can show pretext directly, by showing that

discrimination [or retaliation] more likely motivated the

employer, or indirectly, by showing that the employer's

explanation is unworthy of credence."  Vasquez v. Cnty. of Los

Angeles, 349 F.3d 634, 641 (9th Cir. 2003); see also Coghlan v.

Am. Seafoods Co., 413 F.3d 1090, 1094-95 (9th Cir. 2005).

"Direct evidence typically consists of clearly sexist, racist, or

similarly discriminatory [or retaliatory] statements or actions

by the employer."  Coghlan, 349 F.3d at 1095.  Circumstantial

evidence requires an additional inferential step to demonstrate

discrimination.  Id.

> Despite this "useful tool" of the McDonnell
> Douglas framework, there is nothing that "compels
> the parties to invoke the McDonnell Douglas
> presumption."  McGinest, 360 F.3d at 1122.  "When
> responding to a summary judgment motion . . . [the
> plaintiff] may proceed by using the McDonnell
> Douglas framework, or alternatively, may simply
> produce direct or circumstantial evidence
> demonstrating that a discriminatory reason more
> likely than not motivated [the employer]."
> Metoyer v. Chassman, 504 F.3d 919, 931 (9th Cir.
> 2007) (quoting McGinest, 360 F.3d at 1122).  If
> the plaintiff submits direct or circumstantial
> evidence, "a triable issue as to the actual
> motivation of the employer is created even if the
> evidence is not substantial."  Id. (quoting Godwin
> v. Hunt Wesson, Inc., 150 F.3d 1217, 1221 (9th
> Cir. 1998)).

Hughes, 721 F. Supp. 2d at 957-58.

The same general framework applies for both Plaintiff's Title VII and Hawai'i state law discrimination claims. See Schefke v. Reliable Collection Agency, Ltd., 96 Hawai'i 408, 426, 32 P.3d 52, 70 (2001); Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1064 (9th Cir. 2002) (recognizing that Hawai'i courts use the McDonnell Douglas framework in analyzing analogous state law claims). Accordingly, the Court provides a single framework and analysis for these claims.

Defendants argue that Plaintiff has not met his burden of establishing a prima facie case of discrimination because he cannot show that Jones Group treated similarly situated younger, non-Black employees more favorably. The Court disagrees. There is some evidence that another similarly situated employee who did not belong to the same protected class was treated differently. For example, Plaintiff states that, on January 20, 2008, he was written up and sent home from work by Assistant Manager Claire Neyra for being inappropriately dressed. [Khufu Decl. ¶ 21.] Plaintiff claims that another employee, "Rob" (a Caucasian in his twenties), was "allowed to wear shirts with labeling on them but I was not. I was written up for no reason." [Id. at ¶ 22.] For the purposes of summary judgment, the Court finds that Plaintiff has satisfied the minimal requirement necessary to establish a prima facie case. See Cordova, 124 F.3d at 1148 ("The requisite

degree of proof necessary to establish a prima facie case for Title VII . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." (citation omitted)).

Defendants assert a legitimate, non-discriminatory reason for Plaintiff's termination, namely, his repeated failure to work when scheduled or call the store prior to such absences (*i.e.*, "no call, no show"). Plaintiff's termination did not result from violations recorded on the Associate Progressive Counseling forms or other work-place issues. The burden then shifts to Plaintiff to demonstrate that this proffered explanation is pretextual.

Defendants argue that Poulin, the Human Resources Manager who made the ultimate decision to terminate Plaintiff, did not consider Plaintiff's race, color or age when making the decision. Plaintiff, however, argues that he was "set up" to not be able to show up for work, as evidenced by his managers' "underlying racially motivated actions in creating the scenario to terminate Plaintiff." [Mem. in Opp. at 5.] Plaintiff relies on the Supreme Court's recent decision in Staub v. Proctor Hosp., 131 S. Ct. 1186 (2011).

In Staub, the Supreme Court considered the circumstances under which an employer may be held liable for the discriminatory animus of an employee who influenced, but did not

make, the ultimate adverse employment decision.  This is
sometimes referred to as "cat's paw" liability.  <u>See</u> <u>Poland v.</u>
<u>Chertoff</u>, 494 F.3d 1174, 1182-83 (9th Cir. 2007); <u>EEOC v. BAI</u>
<u>Coca-Cola Bottling Co. of Los Angeles</u>, 450 F.3d 476, 486 (10th
Cir. 2006) ("A biased low-level supervisor with no disciplinary
authority might effectuate the termination of an employee from a
protected class by recommending discharge or by selectively
reporting or even fabricating information in communications with
the formal decision maker.").  <u>Staub</u> held that, where an employee
performs an act motivated by discriminatory animus intending to
cause an adverse employment decision, the employer will be liable
if that act is a proximate cause of the eventual adverse
employment decision.  131 S. Ct. at 1194.

Here, Defendants argue that there is no evidence that
any supervisor was motivated by unlawful animus, like race or age
discrimination, so the theory in <u>Staub</u> does not apply.  There is,
however, some evidence – albeit slight – of conduct by
Plaintiff's supervisors that raises an issue of fact regarding
unlawful animus.  For example, Plaintiff states that in November
2007, he "was instructed by Santiago to tell a black male who had
requested an employment application that she was not available
and that he would be wasting his time by filling ou[t] the
application."  [Khufu Decl. ¶ 13.]  Plaintiff argues that there
is evidence of Santiago's bias during his initial application and

hiring, although she made no statement explicitly referencing Plaintiff's race, color, or age. Santiago's alleged statement discouraging Samuelsson from hiring Plaintiff, coupled with Plaintiff's assertion that Samuelsson told him that Defendants did not normally hire black men of his age, could support an inference of unlawful animus. Further, Santiago was responsible for preparing the work schedule that conflicted with Plaintiff's Spring Semester schedule, and which eventually led to his termination for violation of the attendance policy.

Plaintiff also argues that there is an issue of fact regarding when Santiago created the schedule. According to Santiago, she prepared the store schedules for January 2008, and likely posted them sometime in December 2007. [Santiago Decl. ¶ 15.] Plaintiff claims that Santiago prepared and posted weekly schedules the week prior to the next work week. [Khufu Decl. ¶ 16.] Plaintiff also argues that, from January 10, 2008 when he notified Neyra, Defendants had actual notice that his work schedule conflicted with school and that he would not be able to work on those days, but that Defendants made no effort to accommodate him, when they did accommodate other employees. Plaintiff claims that, when he asked why he was being scheduled for closing times, he was not given an explanation, and that other employees "received the work/hours they wanted. Brown had a second job and Defendants' man[a]gers worked around Brown's

schedule to accommodate her, but would not do the same for me."
[Khufu Decl. ¶¶ 27-28.]

The Court is mindful that Defendants presented compelling evidence that other similarly situated employees not of Plaintiff's race or age were also terminated for violating the attendance policy. The Court, however, must consider the additional evidence presented by Plaintiff that he was "set up" to violate the attendance policy based on unlawful animus by his supervisors. Thus, although Poulin made the decision to terminate Plaintiff based on violations of the attendance policy, and without any discriminatory intent, that decision may have been made in reliance on factors affected by Plaintiff's supervisors' unlawful animus. See Galdamez v. Potter, 415 F.3d 1015, 1026 n.9 (9th Cir. 2005) ("Title VII may still be violated where the ultimate decision-maker, lacking individual discriminatory intent, takes an adverse employment action in reliance on factors affected by another decision-maker's discriminatory animus."). "The degree to which [the final decision maker's] decisions were based on his own independent investigation is a question of fact." Long v. Eastfield College, 88 F.3d 300, 307 (5th Cir. 1996).

On summary judgment, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." Miller v. Glenn Miller Prods., Inc., 454

F.3d 975, 988 (9th Cir. 2006).  Viewing the facts in the light

most favorable to Plaintiff, the Court concludes that a

combination of factors, any of which judged alone would be less

than compelling, provides sufficient evidence that would allow a

reasonable jury to conclude that Defendants' proffered reason for

terminating Plaintiff was a pretext for discrimination, or "that

a discriminatory reason more likely than not motivated [the

employer]."  <u>Metoyer v. Chassman</u>, 504 F.3d 919, 931 (9th Cir.

2007) (citation and quotation omitted).  Moreover, "a triable

issue as to the actual motivation of the employer is created even

if the evidence is not substantial."  <u>Id.</u> (quoting <u>Godwin v. Hunt

Wesson, Inc.</u>, 150 F.3d 1217, 1221 (9th Cir. 1998)).  Thus, the

Court finds that a genuine issue of material fact exists with

regard to Count I, Plaintiff's claim for discrimination based on

race, color, and age.  Defendants' Motion is therefore DENIED as

to Count I.

## V.    <u>Plaintiff's Economic Damages</u>

        Finally, Defendants assert that Plaintiff's economic

damages are limited to $4,800.  After he was terminated by Jones

Group, Plaintiff worked at Banana Republic in Waikiki, where he

earned ten dollars per hour for thirty hours per week, from June

2008 to January 2009, when the store closed.  [Kee Decl., Exh. K,

Plaintiff's Answers to Interrogatories, at ¶¶ 9, 11.]  Plaintiff

did not seek work after that because he was a full-time student.

[<u>Id.</u> at ¶ 11.]

   While a plaintiff has a duty to use reasonable diligence in finding other suitable employment, the employer has the burden of proving the plaintiff's failure to mitigate damages.  <u>See</u> <u>Odima v. Westin Tucson Hotel</u>, 53 F.3d 1484, 1497 (9th Cir. 1995).  Plaintiff offered no argument in his memorandum in opposition regarding his failure to mitigate.  At the May 16, 2011 hearing, Plaintiff did not contest Defendants' assertions that he failed to use reasonable diligence in seeking substantially equivalent employment and that his economic damages were limited to $4,800.  The Court therefore GRANTS Defendants' Motion with respect to Plaintiff's failure to mitigate damages, and concludes that Plaintiff's damages for lost wages are limited to no more than $4,800.

<u>**CONCLUSION**</u>

   On the basis of the foregoing, Defendants JAG Footwear, Accessories and Retail Corporation, formerly known as Jones Retail Corporation, and The Jones Group Inc., formerly known as Jones Apparel Group, Inc.'s Motion for Summary Judgment, filed on March 8, 2011, is HEREBY GRANTED IN PART AND DENIED IN PART as follows:

   1.   The Motion is DENIED as to Count I;

   2.   The Motion is GRANTED as to Counts II, III, and IV; and

   3.   The Motion is GRANTED with respect to Plaintiff's

failure to mitigate damages, and Plaintiff's damages for lost wages are limited to no more than $4,800.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, May 31, 2011.



    /S/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**SEBREN KHUFU V. JONES RETAIL CORPORATION, ET AL; CIVIL NO. 10-00262 LEK-BMK; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**